[Cite as *State v. Williams*, 2011-Ohio-4726.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                           :

    Plaintiff-Appellee              :       C.A. CASE NO.    24149

v.                                       :       T.C. NO.    09CR2891

KENDRA WILLIAMS                          :       (Criminal appeal from
                                               Common Pleas Court)

    Defendant-Appellant            :

                                                        :

. . . . . . . . . .

## O P I N I O N

Rendered on the ___16th___ day of ___September___, 2011.

. . . . . . . . . .

LAURA M. WOODRUFF, Atty. Reg. No. 0084161, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

JAMES C. STATON, Atty. Reg. No.0068686, 5613 Brandt Pike, Huber Heights, Ohio 45424
    Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

{¶ 1} Kendra Williams was convicted after a jury trial in the Montgomery County Court of Common Pleas of violating a protection order, in violation of R.C. 2919.27(A)(2). Williams had previously been convicted of violating a protection order involving the same victim, making her present conviction a fifth degree felony.  R.C. 2919.27(B)(3).  The trial

court sentenced her to one year in prison.

{¶ 2} Williams appeals from her conviction, claiming that the trial court erred in denying her the right to call police officers as witnesses and in permitting the State to offer certain evidence. For the following reasons, the trial court's judgment will be affirmed.

I

{¶ 3} The State's evidence at trial established the following facts.

{¶ 4} Kendra Williams and Courtney Fails ("Fails") both have children fathered by Lamon Houston. Fails met Williams shortly after she (Fails) began dating Houston, approximately four years before the trial (i.e., about 2006), and Williams's children with Houston had been to Fails's home with their father.

{¶ 5} In September 2007, Fails obtained a protection order against Williams; the order was originally scheduled to expire in September 2009. *Fails v. Williams*, Greene C.P. No. 2007-SP-60. At trial, the parties stipulated that, on January 16, 2009, Williams pled guilty in the Montgomery County Common Pleas Court to violating a protection order, contrary to the same Revised Code section with which Williams was currently charged. See *State v. Williams*, Montgomery C.P. No. 2008-CR-3151.

{¶ 6} In July 2009, Williams attempted to get a protection order against Fails; around the same time, Fails sought an extension of her protection order against Williams. Fails received the court's decisions granting her extension and denying Williams's request on August 29, 2009.

{¶ 7} At approximately 4:15 p.m. on August 29, 2009, Williams drove to Fails's home in her purple Chrysler, a vehicle that Fails recognized. Knowing that Williams's

children were ill, Fails told Houston to go outside and talk to Williams. Fails stood on the porch as Houston spoke with Williams through the car window. Shortly thereafter, a woman that Fails did not know drove up to Fails's house, got out of her car, and started demanding, "Where's she at?" Fails "realized there was about to be a problem" and went inside to call the police; Fails tried to call several times, but the calls "were dropping" due to poor reception. Fails called her mother, Gloria Fails, and told her what was happening. Fails then went back onto the porch and saw more cars of women pulling up to her home. Fails recognized Alicia Stewart as part of the group, but she did not recognize any of the other women.

{¶ 8} Williams got out of her car with at least one kitchen knife, approached Fails, and screamed that Fails "was going to die today." The other women also yelled and threatened Fails; Fails screamed back at them. Houston stood between Fails and the women and tried to restrain Williams. As he did so, Houston's hand was cut by one of Willams's knives.

{¶ 9} Gloria Fails came to the scene. When she arrived, Gloria Fails saw "four or five carloads" of women and children. The women were in Fails's yard, yelling, screaming, and cursing at Fails. Gloria Fails went up to the front stoop, where Fails and Houston were standing. As she went onto the front porch, Williams called to Gloria Fails from the bottom of the stairs. Gloria Fails asked Williams why she was there and told her that she should not be there. Gloria Fails noticed that the crowd "seemed to start getting a little antsy." She went down the steps and, when it appeared to her that the crowd was going to go past her and up to the house, Gloria Fails called 911.

{¶ 10} At approximately the same time, a neighbor who was witnessing the scene also called 911. The neighbor testified that a woman in a red shirt and jeans had spoken with Fails's "baby daddy" and then got out of the car and threatened Fails with a knife. Fails testified that Williams had been wearing blue jeans and a red shirt.

{¶ 11} While Gloria Fails was talking with the police dispatcher, she walked to the sidewalk and began to read aloud the license plate numbers of the cars in front of Fails's home. After Gloria Fails provided two license plate numbers, "[a] girl *** started drowning [her] out and they all just started scattering and running and jumping into cars and they left."

{¶ 12} Dayton police officers Kyle Thomas and Zach Farkus responded to Fails's residence. When they arrived, only Fails, Houston, and a child were there. The officers spoke with Fails and Houston about the events and focused on Williams as a suspect. The officers also noticed that Houston had a fresh cut on the back of one of his hands. Fails showed the officers a copy of the protection order that she had against Williams. After the officers confirmed the existence of the protection order, they put out a broadcast for Williams's arrest.

{¶ 13} Detective Justin Hayes continued the investigation. He met with Fails and took a written statement from her. He also listened to a tape of the 911 calls and obtained records from the Bureau of Motor Vehicles related to the calls. One of the license plates mentioned in Gloria Fails's 911 call belonged to a 1995 four-door Chrysler vehicle registered to Williams.

{¶ 14} In her defense, Williams claimed that she had an alibi for the time of the

alleged confrontation with Fails. Williams testified that she was at her home in Dayton during the morning of August 29, 2009, and then she took the bus with her friend, Alicia Stewart, to the home of their friend, Jackie. While Williams was at Jackie's residence, she received a call from her younger sister, Carrie Patterson, who told her that the police had been to her (Williams's) house and had left a number for Williams to call. Williams called back that number. Williams stated that she stayed at Jackie's home until it was "almost dark." Williams denied that she had gone to Fails's residence on August 29, 2009, and she stated that her car was broken and in her driveway on that date.

{¶ 15} Patterson and Stewart testified on Williams's behalf. Patterson testified that she was at Williams's residence with Williams on August 29, 2009 until Williams left around 2:00 p.m. She stated that, later that evening, Dayton police officers came to the house, looking for Williams. The officers stayed for no more than ten minutes. Patterson stated that she later had an appointment to meet with Detective Hayes at her home, but he never came.

{¶ 16} Alicia Stewart testified that she met with Williams at approximately 1:00 p.m. and the two took the bus to Jackie's home in Trotwood to try on lace wigs. Stewart testified that they stayed at Jackie's apartment until approximately 5:30 or 6:00 p.m. Stewart described the day as a typical day. The only unusual event was that Patterson had called to say that the police had told her (Patterson) that Williams's car had been reported stolen. Stewart and Williams had thought the call "was a joke" because the car was broken.

{¶ 17} Based on the evidence, the jury found Williams guilty of violating a protection order on August 29, 2009, and, further, that Williams had previously pleaded

guilty to violating a protection order. The trial court subsequently sentenced Williams to one year in prison.

{¶ 18} Williams appeals from her conviction, raising two assignments of error.

II

{¶ 19} Williams's first assignment of error states:

{¶ 20} "THE APPELLANT WAS DENIED A FAIR TRIAL BECAUSE SHE WAS NOT PERMITTED TO CALL POLICE OFFICERS AS WITNESSES, AND INSTEAD HAD TO RELY ON THE TESTIMONY OF A LESS CREDIBLE WITNESS."

{¶ 21} In her first assignment of error, Williams claims that her due process rights were violated when she was denied the right to call police officers to testify regarding their appearance at her home on August 29 and, instead, was forced to rely on Patterson's testimony. Williams notes that Patterson had a theft conviction, which the trial court had instructed could be used to assess a witness's credibility.

{¶ 22} In a criminal trial, a defendant's right to due process, as guaranteed by the Ohio and United States Constitutions, "is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi* (1973), 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297, cited in *State v. Swann*, 119 Ohio St.3d 552, 2008-Ohio-4837, ¶12. The right to a fair and meaningful opportunity to defend includes the right to present witnesses. *Washington v. Texas* (1967), 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (saying that "a fundamental element of due process of law" is the right to present witnesses).

{¶ 23} After the conclusion of all the testimony and prior to closing arguments, Williams expressed to the trial court that she was dissatisfied with her counsel's

representation. She asserted that the police officers who came to her home on August 29, 2009 should have been called to testify that her vehicle was in her driveway. Williams and the trial court had the following exchange outside the presence of the jury:

{¶ 24} "THE DEFENDANT: I feel as though that I'm not getting represented right. I feel like I don't have – it's not a fair trial. The police that was involved that came to my house is like – we just got my witness who seen me when I left the house and where I was at, but it's like – it's like, we're lying about the police, you know, that the police never showed up, because [where] are the police at. If I was sitting on the jury stand, I'm like well, if the police came to the scene, where's the police officer that came to the house?

{¶ 25} "***I asked lawyer after lawyer to help me show me evidence, nothing ever came about. And then the police not even on the stand who seen my car at my house. You know what I'm saying ***. [T]hey say the police tell the truth. They shouldn't have no reason to lie to say they seen my car there. ***

{¶ 26} "*** [Defense counsel] said that he couldn't get the police officer because of my sister, but they can't even let my sister tell what they [the police] said. It's like, I don't understand. I just don't understand it. I felt like I wasn't represented right at all. [The State] got money to get police phone calls and all that. They have a right to – I have a right to have the police come that came to my house too, right?

{¶ 27} "THE COURT: I think your sister did testify that the police officer was there. That's what I heard.

{¶ 28} "THE DEFENDANT: But wouldn't it be more – wouldn't it be best if the police officer came and said well, we seen her car there, her car wasn't there. You know, I

mean, that's just like the police officer should have showed up here. If Courtney said the police came, then that was her word against the police came.

{¶ 29} "THE COURT:   Well, what I can tell you, ma'am, is that sometimes at trial, whether it be civil or criminal trials, sometimes not everything that you think or that one person thinks needs to come out comes out.   Even if you have witnesses here, it doesn't always come out the way you want it to come out as far as the testimony is concerned.

{¶ 30} "I can tell you that Mr. Miles is an experienced attorney.   And if you believe questions should have been asked, my indication is that probably in his professional opinion, he did not believe that was the appropriate thing to do to represent you.   We are going to go ahead with closing arguments and then I'm going to charge the jury. ***"

{¶ 31} Under the circumstances of this case, the trial court did not deny Williams her right to call witnesses to defend against the State's case.   Williams was represented by counsel, who called Patterson and Stewart to testify on her behalf.   The decision whether to call the police officers who came to Williams's home on August 29 was the province of defense counsel, not the trial court.   Although Williams expressed displeasure with her attorney's decision not to call the police officers to testify, the trial court did not infringe on her right to due process when it deferred to counsel's decision on his presentation of defense witnesses.

{¶ 32} Parenthetically, we cannot determine, based on the record before us, whether counsel's decision not to call the police officers as defense witnesses was a reasonable one. The record does not reflect what the testimony of those officers would have been and whether it would have affected the outcome of Williams's trial.   It is mere speculation that

the officers' testimony would have assisted Williams's defense. To the extent that ineffective assistance of counsel could have been raised based on counsel's failure to call the officers to testify, such a claim required evidence outside of the record on appeal and thus would have been a matter for post-conviction relief.

{¶ 33} The first assignment of error is overruled.

III

{¶ 34} Williams's second assignment of error states:

{¶ 35} "THE COURT ERRED IN OVERRULING APPELLANT'S OBJECTIONS TO THE INTRODUCTION OF RECORDS WITHOUT FOUNDATION, SPECULATIVE TESTIMONY, STIPULATED INFORMATION, AND IRRELEVANT TESTIMONY."

{¶ 36} In her second assignment of error, Williams claims that the trial court erred in admitting BMV records and testimony regarding (1) when Williams learned that her request for a protection order had been denied, (2) Williams's prior conviction for violating a protection order, and (3) whether Williams's children were well-behaved.

{¶ 37} The admission or exclusion of evidence is left to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *State v. Sage* (1987), 31 Ohio St.3d 173, 180. An abuse of discretion implies an arbitrary, unreasonable, unconscionable attitude on the part of the trial court. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶130.

{¶ 38} First, Williams contends that the State improperly introduced BMV records through Detective Hayes, who was not an employee of the BMV. She argues that the BMV records were not properly authenticated and should have been excluded.

{¶ 39} Williams objected at trial to the introduction of the BMV records, arguing that the records were hearsay, that the detective lacked first-hand knowledge of the information, and that the introduction of the records through the detective violated her confrontation rights. The State responded that the BMV records were exempt from the hearsay rule and were self-authenticating. The State thus claimed that no extrinsic evidence of authenticity was required.[1]

{¶ 40} "Authentication, which is evidence sufficient to support a finding that the matter in question, including documentary evidence, is what its proponent claims, is a condition precedent to admissibility of that matter in evidence." *Royse v. Dayton*, Montgomery App. No. 24172, 2011-Ohio-3509, ¶27, citing Evid.R. 901(A). Certain documents are self-authenticating, meaning that extrinsic evidence of authenticity is not required for the document to be admissible. Evid.R. 902. Of relevance, self-authenticating documents include:

{¶ 41} "(1) Domestic public documents under seal. A document bearing a seal purporting to be that of the United States, or of any State, district, Commonwealth, territory, or insular possession thereof, or the Panama Canal Zone, or the Trust Territory of the Pacific Islands, or of a political subdivision, department, officer, or agency thereof, and a signature purporting to be an attestation or execution.

{¶ 42} "***

{¶ 43} "(4) Certified copies of public records. A copy of an official record or report

---

[1] Defense counsel's objection focused on Williams's confrontation rights and the ability of the detective to authenticate the BMV records. Counsel did not raise deficiencies in the Record Request Certification. We will assume, for the sake of argument, that his objection encompassed an argument that the records were not self-authenticating.

or entry therein, or of a document authorized by law to be recorded or filed and actually recorded or filed in a public office, including data compilations in any form, certified as correct by the custodian or other person authorized to make the certification, by certificate complying with paragraph (1), (2), or (3) of this rule or complying with any law of a jurisdiction, state or federal, or rule prescribed by the Supreme Court of Ohio." Evid.R. 902(1), (4).

{¶ 44} State's Exhibit 8 consists of copies from the BMV of the 2009 and 2010 Certificates of Registration for a 1995 Chrysler sedan registered to Williams. The first page of the exhibit, entitled Record Request Certification, "certifies that a search has been made of the files and records of the Ohio Registrar of Motor Vehicles; that the attached documents are true and accurate copies of the files or records of the Registrar; and that the Registrar's official seal has been affixed ***." The BMV official seal is located at the bottom of the page. The certification concludes with "Registrar, Ohio Bureau of Motor Vehicles." Underneath, a notation indicates that the record may have been created "By: JAP." No BMV employee is identified, and there is no handwritten signature attesting to the record's authenticity or accuracy.

{¶ 45} It is questionable whether the BMV records offered by the State, which lack a handwritten signature, are self-authenticating under Evid.R. 902. Addressing a similar BMV document, which lacked a "signature, notarization, or affidavit attesting to the record's authenticity," the Twelfth District held that the record was not self-authenticating. *State v. Lee*, 191 Ohio App.3d 219, 2010-Ohio-6276, ¶30. In *Lee*, the BMV records had a cover page with a certification paragraph, followed by "a notation indicating that the record may

have been created 'By: TVNSICKL.'" There was no additional information as to the individual's identity, the individual's position at the BMV, or the individual's knowledge of appellant's driving record. The Twelfth District concluded that the BMV records were not self-authenticating under Evid.R. 902, stating:

{¶ 46} "Subsections (1) and (2) of Evid.R. 902 both require an accompanying signature. As described above, the BMV record in this case bears no signature. Subsection (4) states that the record must be accompanied by an acknowledgment from a 'custodian or other person authorized to make the certification.' There is no indication on the BMV record that a custodian or authorized individual certified the record. The section also refers to subsections (1), (2), and (3), which require accompanying signatures. Subsections (8) and (10) refer to documents executed or declared by law to be authentic. In this case, the applicable Ohio law for authenticating BMV records is R.C. 4501.34(A). As previously discussed, the BMV record does not comply with R.C. 4501.34(A). Accordingly, the BMV record submitted in this case does not qualify as a self-authenticating document under Evid.R. 902." *Lee* at ¶37.

{¶ 47} We need not decide whether to follow *Lee* because, regardless of whether the BMV records in this case are self-authenticating, we do not find that the introduction of those BMV records was prejudicial. Fails and her mother both testified that Williams was at Fails's home; Fails stated that Fails was wearing jeans and red shirt, and Fails's neighbor reported seeing a woman in that clothing at Fails's home. Fails reported seeing Williams's car, a Chrysler, and Gloria Fails stated in her 911 call that a vehicle with licence plate number EKW 3289 was at Fails's house; Williams acknowledged on cross-examination that

license plate EKW 3289 was registered to her and went with her Chrysler. Accordingly, any error in the admission of the BMV records through Detective Hayes was harmless.[2]

{¶ 48} Second, Williams asserts that the trial court improperly allowed the State, over defense counsel's objection, to elicit testimony that Williams had sought a protection order against Fails and that the court in that case had ruled on Williams's request just prior to the confrontation with Fails.

{¶ 49} During Detective Hayes's testimony, the State asked him whether he had discovered that Williams had filed for a protection order against Fails. Defense counsel objected to that question, and the objection was sustained.

{¶ 50} In a sidebar discussion following that ruling, the prosecutor explained to the court that Williams's request for a protection order had been denied and that Fails had received the order denying the request on the same day as the incident at issue; the prosecutor contended that this evidence explains what "set her [Williams] off." Defense counsel responded that the State was speculating about Williams's motive for her alleged actions. The court ruled that the State could elicit testimony that Williams had filed for a protection order, that the decision was made, and that Fails received the decision in the mail on August 29, 2009. The court indicated that "that's about all that needs to come out unless [Williams] gets on and testifies to it."

{¶ 51} When Fails subsequently testified, the State elicited testimony that Williams had tried to get a protection order against Fails and that Fails had received a decision on that

---

[2] During closing argument, defense counsel referenced the BMV records in support of Williams's claim that her car was broken. He stated: "Now, you'll look at the BMV records and you'll see that the age of the car, and the age of the car from your life experiences, will indicate that maybe the cars of that age does constantly need repairs."

request on "the same day this incident took place," i.e., August 29, 2009. On cross-examination, defense counsel asked Fails whether she had requested an extension of the protection order she had against Williams. Fails testified that "[m]y determination as well as her getting declined on her order, everything came in the mail that day that she showed up." Fails acknowledged that she did not know what Williams had received.

{¶ 52} Williams argues that the testimony regarding her request for a protection order was irrelevant, because the State was not required to prove why Williams might have been upset.

{¶ 53} Relevant evidence is generally admissible whereas irrelevant evidence is not. Evid.R. 402. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 402; Evid.R. 403(A).

{¶ 54} Under Evid.R. 404(B), evidence of other acts by a defendant is admissible to establish motive. "Motive has been defined as 'a mental state which induces an act; the moving power which impels action for a definite result.' *Smith [v. Burson* (1974), 38 Ohio St.2d 157]. Because it is assumed that human conduct is prompted by a desire to achieve a specific result, motive is generally relevant in criminal trials even though the matter involved is not an element of the offense which the prosecution must prove to secure a conviction. Id. It is, unless readily evident from the accused's conduct, a part of the narrative of the

state's theory of its case against the accused seeking to prove his criminal liability." *State v. Ratliff,* Montgomery App. No. 19684, 2003-Ohio-6905, ¶20.

{¶ 55} In this case, evidence that Fails had received, on August 29, 2009, both an extension of her protective order as well as the order denying Williams's request for a protection order supports a conclusion that Williams would have been upset with Fails on that date. As such, it is relevant to the State's case and to explain Williams's actions on August 29, 2009. Although evidence explaining why Williams might have acted out against Fails might weigh against Williams, we do not find that the probative value of this evidence is outweighed by a risk of undue prejudice or of misleading the jury.

{¶ 56} Third, Williams claims that the trial court erred in overruling her objection to testimony regarding her prior conviction for violating a protection order, when the testimony was unnecessary in light of Williams's stipulation to that conviction. Williams asserts that the only purpose of this testimony was "to further disparage Appellant before the jury with evidence of a prior bad act."

{¶ 57} "It is fundamental that the State must prove every element of a charged offense, beyond a reasonable doubt. *In re Winship* (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368. Whenever it is necessary to prove a prior conviction, a certified copy of the entry of judgment of the prior conviction, together with evidence sufficient to identify the defendant named in the entry as the offender currently charged, is sufficient to prove the prior conviction. R.C. 2945.75(B)(1)." *State v. Reid*, Montgomery App. No. 23409, 2010-Ohio-1686, ¶9.

{¶ 58} In this case, Williams was indicted for violating a protection order "having

been previously convicted of or pleaded guilty to a violation of this section ***." The indictment specified that Williams had pled guilty to violating a protection order on January 16, 2009, in Montgomery C.P. No. 2008 CR 3151. At trial, Williams and the State stipulated that "Defendant Kendra Williams, who is the same individual charged in this current case, entered a plea of guilty to Violating a Protection Order in case number 2008 CR 3151 in the Montgomery County Common Pleas Court on January 16, 2009," and that "the Violating a Protection Order section to which she entered a plea of guilty to is the same section now charged in the current case." (Joint Ex. 2.) This stipulation satisfied the State's burden to establish that Williams had previously been convicted of violating a protection order, as charged in the indictment.

{¶ 59} Williams later testified on her own behalf. During cross-examination, the State asked, over defense counsel's objection, whether Williams had entered a guilty plea on January 16, 2009 to violating a protection order. The State presented Williams with her plea form, and Williams verified that she had signed the form. There were no questions asked regarding the details of the prior offense. The State did not ask about any other felony convictions or any crimes involving dishonesty, nor was there any suggestion that Williams had committed any other offenses.

{¶ 60} "When the State seeks to attack the credibility of a testifying defendant, 'evidence that the accused has been convicted of a crime is admissible if the crime was punishable by death or imprisonment in excess of one year *** and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.'" *State v. Lawson*, Montgomery App.

No. 23456, 2010-Ohio-3114, ¶17, quoting Evid.R. 609(A)(2). The decision whether to admit evidence under Evid.R. 609 is left to the sound discretion of the trial court, and a reviewing court will not override that decision absent an abuse of discretion. Id.

{¶ 61} Although the parties had already stipulated to the conviction about which the State asked during its cross-examination of Williams, we find no abuse of discretion in the State's decision to permit such questioning. The State was permitted under Evid.R. 609(2) to question Williams about her prior convictions and, in doing so, it limited its questions to whether Williams had committed the offense and whether she had signed the plea form. The State did not delve into the facts underlying the conviction or otherwise belabor the point.

{¶ 62} Moreover, following closing arguments, the jury was instructed regarding the proper use of testimony regarding prior convictions. The court told the jury:

{¶ 63} "Testimony was introduced that witnesses were convicted of criminal acts. This testimony may be considered for the purpose of helping you test the credibility or weight to give those witnesses['] testimony. It cannot be considered for any other purpose. The testimony of the Defendant, Kendra Williams, is to be weighed by the same rules that apply to other witnesses. Evidence was received that the Defendant pled guilty to a violation of a protection order. That evidence was received because a guilty plea is an element of the offense charged. It was not received and you may not consider it to prove the character of the Defendant in order to show that she acted in conformity with that character. Instead, you may only consider that evidence when considering the elements of the offense of violation [of] a protection order. You may not consider it for any other

purpose."

{¶ 64} We presume that the jury followed the trial court's instructions. E.g., *Lawson* at ¶22.

{¶ 65} Finally, Williams asserts that the trial court erred in permitting the State to question Fails, Stewart, and Williams about Williams's children. The prosecutor, without objection from defense counsel, asked Fails about her contact with Williams's children; Fails testified that Williams's children were "very nice" and "very well behaved." Counsel also did not object when Williams was asked on cross-examination if her children were well-mannered, as Fails had testified, and when the prosecutor asked Stewart if Williams was a good mother. Defense counsel did object when Stewart was asked, "So you wouldn't want to see the Defendant separated from her kids?" That objection was overruled and Stewart responded, "No."

{¶ 66} The State asserts that each of these questions was relevant. It argues that the question to Fails showed that Fails was "willing to give Williams credit where credit was due." The question to Stewart was intended to show that Stewart "had a reason to protect [Williams] with a false alibi," and the question to Williams was asked so that Williams would be "put in the position of acknowledging that Fails, who was in the defense version, not truthful about the melee, was truthful when she talked about Williams' kids."

{¶ 67} Although we understand the State's explanations in asking witnesses about the behavior of Williams's children, we agree with Williams that the behavior of Williams's children was irrelevant to the issues before the jury. In addition, we find objectionable the question to Stewart about Stewart's not wanting Williams to be separated from her children,

particularly when the jury would have no reason to believe, and should not be led to speculate, that a conviction would cause that alleged separation.

{¶ 68} Nevertheless, in light of the evidence presented in this case, we do not find that the admission of this testimony affected the outcome of Williams's trial. Each witness described Williams's children as well-behaved and Stewart stated that Williams was a good mother, all of which reflected well on Williams as a mother. As for the question to Stewart, Stewart had testified regarding her friendship with Williams and the fact that she, Williams, and other women get together and "hang out" while their children play. Stewart's alleged bias based on their friendship was supported by other evidence. Stewart had denied this bias, testifying that she was "a loyal friend, but I'm not going to lie for nobody." Construing the evidence as a whole, the State's questions did not rise to the level of prejudicial error.

{¶ 69} Williams's second assignment of error is overruled.

IV

{¶ 70} The trial court's judgment will be affirmed.

. . . . . . . . . .

DONOVAN, J., concurs.

HALL, J., concurring:

{¶ 71} I agree with the majority's disposition of this appeal but write separately because I think the Bureau of Motor Vehicle records for the defendant's car registration, State's Exhibit 8, are self-authenticating and, in this case, admissible. Even though the self-authentication issue is not dispositive in the majority's opinion, it is nonetheless

addressed and so that silence will not be misconstrued as agreement or acquiescence, I concur separately.

{¶ 72} In the BMV records here there is a cover page on which is printed the BMV's official blue seal, but there is no "signature." Rather, printed on the page, on three separate lines, is this: "Registrar, Ohio Bureau of Motor Vehicles, by: JAP." The location of the by-line suggests that "JAP" are the initials of the person who approved the records' printing. The majority says that "[i]t is questionable whether the BMV records offered by the State, which lack a handwritten signature, are self-authenticating under Evid. R. 902." I do not think that a handwritten signature is required.

{¶ 73} By statute, only the BMV's official seal is required to authenticate its records. R.C. 4501.34, entitled "Records and proceedings of registrar," states:

{¶ 74} "(A) The registrar of motor vehicles may adopt and publish rules to govern the registrar's proceedings. All proceedings of the registrar shall be open to the public, and all documents in the registrar's possession are public records. The registrar shall adopt a seal bearing the inscription: 'Motor Vehicle Registrar of Ohio.' *The seal shall be affixed to all writs and authenticated copies of records, and, when it has been so attached, the copies shall be received in evidence with the same effect as other public records*. All courts shall take judicial notice of the seal." (Emphasis added.). In addition, the rules of evidence support acceptance of public records when based upon statutory authority. Evid.R. 902(4) and (10) both permit the admission of public records that comply with "any law of a jurisdiction, state or federal." The BMV records here are properly authenticated under R.C. 4501.34. Therefore, I believe, they are admissible.

{¶ 75} The majority refers to the Twelfth District case of *State v. Lee*, 191 Ohio App.3d 219, 2010-Ohio-6276, for the proposition that BMV records, with a certification virtually identical to that in this case, are not admissible and do not comply with 4501.34. I do not agree with *Lee*'s resolution of this issue.

{¶ 76} In *Lee*, the Twelfth District concluded that the BMV records in that case were not "authenticated" because no individual attested to the records or signed the document. But the statute doesn't require attestation or a signature. What the records in *Lee* did have, like the records here, was a "certification" page that refers to R.C. 4501.34's actual requirements: "This certifies that a search has been made of the files of the Ohio Registrar of Motor Vehicles: that the attached documents are true and accurate copies of the files or records of the Registrar; and that the Registrar's official seal has been affixed in accordance with Ohio Revised Code (R.C.) 4501.34(A)."   In my view this certification is an authentication. Thus the only "missing" element in *Lee* was a "wet" signature–which, I believe, is statutorily unnecessary.

{¶ 77} In our electronic age, countless transactions of many different types are completed every day that no longer require a "wet" signature. Billions of dollars change hands every day without a "wet" signature. State of Ohio employees–including state-paid judges–who still receive paychecks (rather than have their pay directly deposited into a bank account) receive checks that lack a "wet" signature. For more than a year now, the Montgomery County Common Pleas Court has filed documents without a "wet" signature on them. All civil decisions and entries are "signed" electronically with the click of a mouse. In Ohio, the signature, and seal, of the clerk of courts is mechanically printed on an original

certificate of title for a motor vehicle, even though R.C. 4505.08(A) suggests that the signature, and seal, should be wet: "The clerk shall sign and affix the clerk's seal to the original certificate of title." Surely no court would refuse to admit an original Ohio car title because it was not physically signed, and sealed, by the clerk. Finally, this writer's authority to write this concurrence comes from a judicial commission that lacks the "wet" signature of either the governor or the secretary of state, containing instead only their mechanically reproduced "signatures," and the official seal of the State. It is in this environment that the BMV records should be viewed.

**{¶ 78}** In the absence of any indication of unreliability, I would hold that BMV records that comply with R.C. 4501.34 are admissible as self-authenticating public records. Nothing in this case suggests that the records are anything but authentic. Therefore I would conclude that the BMV records here are admissible.

. . . . . . . . . .

Copies mailed to:

Laura M. Woodruff
James C. Staton
Hon. Connie S. Price