[Cite as *State v. Ruble*, 2017-Ohio-7259.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
WASHINGTON COUNTY

STATE OF OHIO,                          :          Case No. 16CA20

    Plaintiff-Appellee,               :

    v.                                :          DECISION AND
                                                 JUDGMENT ENTRY

MITCHELL R. RUBLE,[1]                   :
                                                 **RELEASED: 08/09/2017**
    Defendant-Appellant.              :

APPEARANCES:

Marc S. Triplett, Bellefontaine, Ohio, for appellant.

Michael DeWine, Ohio Attorney General, and Katherine Mullin and Jocelyn K. Lowe, Ohio Assistant Attorneys General, Cleveland, Ohio, for appellee.

Harsha, J.

{¶1}     After he was convicted of aggravated murder and sentenced to life in prison, Mitchell R. Ruble filed this appeal.

{¶2}     First Ruble asserts that the trial court abused its discretion by admitting the detailed and graphic testimony of two state witnesses concerning his unwarranted use of force as a deputy sheriff against an arrestee.   Although this incident was relevant to his motive for killing his supervisor, a sheriff's lieutenant whose investigation led to Ruble's termination from the sheriff's department, the trial court abused its discretion in determining that unfair prejudice from this evidence did not substantially outweigh its probative value. The state could have established Ruble's motive for the murder – to kill the man whose investigation led to his firing – without introducing inflammatory details of the excessive use of force. Nevertheless, the trial court's error in

---

[1] Ruble died during the pendency of this appeal and this Court substituted his daughter (Heather Wolfson) as the appellant.

admitting this evidence was harmless beyond a reasonable doubt because of the overwhelming remaining evidence of Ruble's guilt, including Ruble's own exhibit that contained most of the same "other acts evidence" he objects to on appeal.

{¶3}   Next Ruble contends that the trial court committed plain error when it violated his constitutional rights to due process, confrontation, and compulsory process by precluding him from calling witnesses who would have established that the key prosecution witness had twice been arrested for impersonating a police officer. Ruble's contention is meritless because the trial court allowed Ruble to cross-examine the witness about his purported arrests for impersonating a police officer. And the court properly applied Evid.R. 608(B), the validity of which the Supreme Court of the United States has implicitly approved in reviewing analogous state evidentiary rules.

{¶4}   Ruble also argues that his trial counsel provided ineffective assistance by failing to file a motion to suppress his post-indictment custodial statement to law enforcement officers, failing to file a motion to redact parts of his statement, failing to object to part of an officer's testimony that was not based on his personal knowledge, and failing to raise objections concerning matters raised in his other assignments of error. We reject Ruble's argument because he cannot establish that those motions had merit or a reasonable probability of producing a different outcome, which would be necessary to establish ineffective assistance of counsel.

{¶5}   Ruble additionally claims that the trial court erred by instructing the jury on aiding and abetting. We reject this assignment of error because a defendant who is indicted for aggravated murder in the language of a principal offense is on notice that evidence could be presented that he was either a principal offender or an aider or

abettor.   Thus, the jury was free to credit evidence that supported the complicity charge.

**{¶6}** Finally, Ruble asserts that his conviction should be reversed because of the cumulative-error doctrine.  This doctrine is inapplicable here in the absence of multiple findings of otherwise harmless error.

**{¶7}** We overrule Ruble's assignments of error and affirm his conviction and sentence.

## I. FACTS

**{¶8}** In 1981, someone fatally shot Washington County Lieutenant Sheriff Ray Clark through a kitchen window of Clark's home.  Over 33 years later, in September 2014, the grand jury charged Ruble with the aggravated murder.  After he pled not guilty, the case initially proceeded in 2015 to a trial that resulted in a hung jury.  In 2016, a second jury trial produced the following evidence.

**{¶9}** On the evening of February 7, 1981, an unknown assailant shot Lt. Ray Clark of the Washington County Sheriff's Office through a window in the kitchen of his home.  Clark was transported to a hospital, where he died from a gunshot to his head.  The investigating officers made a plaster cast of a shoe print, which resembled a military-style boot, from the area outside Lt. Clark's house.  They also found a No. 4 buckshot shotgun shell casing at the murder scene.  Multiple witnesses reported observing a blue Ford Pinto station wagon suspiciously driving and parking in different areas near the home at the time of the murder.

**{¶10}** Ruble became a possible suspect shortly after the murder.  He had a motive to kill Lt. Clark, who led an investigation into Ruble's excessive use of force

against an arrestee in 1981 when Ruble was a deputy sheriff.  The investigation led to Ruble's suspension and eventual termination from the sheriff's office.  After a meeting with Lt. Clark in 1981, Ruble left, telling another deputy sheriff that "the [SOB] fired me."  Ruble told another deputy sheriff that he blamed Lt. Clark for his firing.

{¶11}  Within the next few weeks the sheriff's department obtained statements from Ruble, Deputy Sheriff Robert Smithberger, and Penny Howard.  Ruble said that he had left with Howard for Army Reserve drills in West Virginia the Saturday morning of the murder, returned that evening because Howard was sick, and drove his blue Ford Pinto to Smithberger's apartment to spend the night before going back to West Virginia the next morning for more drills.  He admitted drinking wine on the drive back Saturday night, drinking beer at Smithberger's apartment later, and feeling the effects of the alcohol.  He denied any knowledge of Lt. Clark's murder.  In a second statement Ruble admitted drinking a "great big bottle of wine" on the trip back home from West Virginia on the day of the murder.  He advised the sheriff's department to talk to Howard and Smithberger to verify his alibi.

{¶12}  Howard's statement to the sheriff's department mentioned that sometime near the day of the murder, Ruble called Lt. Clark "two-faced" and a "back-stabber," that he would like to "blow him apart," and that the sheriff's office would be better off if Lt. Clark were "six-feet under."  She confirmed that Ruble drank wine while driving her back to Marietta that afternoon.

{¶13}  In statements to the sheriff's department and to a 1999 grand jury, Smithberger repeatedly verified Ruble's alibi, i.e. on the night of Lt. Clark's murder,

Ruble was with Smithberger drinking and sleeping before they had to return to West Virginia for an Army Reserve drill early the next morning.

{¶14} The initial investigation failed to result in any indictments. But in 2011, the Washington County Sheriff's Office opened a Cold Case Unit to focus on unsolved homicides in Washington County; the unit decided to focus on Lt. Clark's unsolved murder. In September 2014, investigators visited Smithberger and questioned him about his and Ruble's involvement in Lt. Clark's murder. Eventually, Smithberger decided to cooperate after he received immunity and witness protection. Ruble's indictment soon followed.

{¶15} Howard testified that Ruble hated Lt. Clark and that on the way back to Marietta the day of the murder, Ruble went into a rant about Lt. Clark, declaring he'd like to blow him in half, but doing that would make Clark look like a martyr. She confirmed Ruble drank the bottle of wine while he was driving back from West Virginia. And according to Howard, Smithberger looked up to Ruble, who dictated everything Smithberger did.

{¶16} Smithberger testified that on the evening of February 7, 1981, Ruble showed up at his apartment, yelling "let's go kill a certain lieutenant." Ruble appeared to be under the influence and asked Smithberger to drive Ruble's blue Pinto station wagon close to Lt. Clark's home, where Ruble got out and told Smithberger to wait for him nearby. Smithberger waited for a while, but eventually returned home and parked Ruble's car close by.

{¶17} According to Smithberger, Ruble subsequently called him to get picked up. Ruble told Smithberger he would kill him if Smithberger told anybody where he had

been that night.  Ruble stuck a big hunting knife against Smithberger's chest and described how he would kill him if he told anybody.  Smithberger testified that he had lied to the police and the grand jury over the many years since Lt. Clark's murder because his life depended on it.

{¶18}  Other testimony established that Ruble wore military boots on the day of the murder and that he had told another deputy sheriff that if you had to shoot a person, you would want to use No. 4 buckshot.  In addition, Detective Lieutenant Jeff Seevers of the Washington County Sheriff's Office testified that he overheard a conversation in which Ruble told the sheriff that he used to drink wine, but that it made him do crazy things.

{¶19}  The state also introduced Ruble's custodial statement, which proclaimed his innocence and lack of involvement in the murder.  Ruble chose not to testify on his own behalf.

{¶20}  After the jury returned a verdict finding Ruble guilty of aggravated murder, the trial court sentenced him to life in prison.

## II. ASSIGNMENTS OF ERROR

{¶21}  Ruble assigns the following errors for our review:

I.  THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ADMITTED TESTIMONY THAT APPELLANT, WHILE A DEPUTY SHERIFF, PHYSICALLY AND MENTALLY ABUSED GARY BEAGLE.

II.  THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT PRECLUDED APPELLANT FROM ADDUCING TESTIMONY THAT THE STATE'S KEY WITNESS COMMITTED TWO SEPARATE INCIDENTS IN WHICH HE HAD IMPERSONATED A PEACE OFFICER.

III.  THE UNREASONABLE ACTS AND OMISSIONS OF TRIAL COUNSEL PREJUDICED APPELLANT AND DENIED HIM THE EFFECTIVE ASSISTANCE OF COUNSEL.

IV.  THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT
INSTRUCTED THE JURY ON AIDING AND ABETTING.

V.  THE CUMULATIVE EFFECT OF THE ERRORS IDENTIFIED IN THE
FIRST THROUGH FOURTH ASSIGNMENTS WARRANTS THE
GRANTING OF RELIEF.

### III. LAW AND ANALYSIS

### A.  OTHER ACTS EVIDENCE

**{¶22}**  In his first assignment of error Ruble asserts that the trial court abused its

discretion when it admitted testimony that as a deputy sheriff, Ruble physically and

mentally abused Gary Beagle, who Ruble had arrested.  At trial Ruble objected on the

basis of Evid.R. 404(B) and 403(A) to the state introducing detailed evidence from

former Washington County Deputy Sheriff John Dake who testified that:  (1) he and

Deputy Ruble arrested Beagle and handcuffed him in the back of their cruiser; (2) Ruble

ordered Dake to stop the cruiser, entered the back seat, grabbed Beagle's hair and hit

him in the head; (3) Ruble stated that he would continue hitting Beagle without leaving

any bruises; (4) Ruble threatened to take Beagle down to the river and throw him in; (5)

Ruble walked Beagle down to the river; and (6) when they returned to the vehicle

Beagle confessed.

**{¶23}**  Ruble also objected to Beagle's testimony that during his arrest, Ruble

pulled back his head and hit him twice while he was handcuffed, walked him down to

the river, put a gun between his eyes, and threatened to shoot him.

**{¶24}**  Based on the state's argument that Lt. Clark's investigation of Ruble's

unwarranted use of force led to Ruble's termination from the sheriff's department, thus

providing the motive for the murder, the trial court admitted this evidence over Ruble's objections.

**{¶25}** In general "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show action in conformity therewith." Evid.R. 404(B). "It may, however, be admissible * * * [to prove] motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* But evidence of other crimes and acts of wrongdoing are strictly construed against admissibility. *State v. Marshall*, 4th Dist. Lawrence No. 06CA23, 2007-Ohio-6298, ¶ 46.

**{¶26}** In determining the admissibility of other acts evidence, trial courts should determine: (1) whether the other acts evidence is relevant to establishing any fact that is of consequence, i.e. the other acts make the existence of a material fact more or less probable than it would be without that evidence; (2) whether the other acts evidence is presented to prove the character of the accused in order to show the accused acted in conformity with that character, or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B); and (3) whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice under Evid.R. 403. *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20; *State v. Adams*, 9th Dist. Lorain No. 15CA010868, 2017-Ohio-1178, ¶ 10; *State v. Fowler*, 2017-Ohio-438, __ N.E.3d __, ¶ 17 (10th Dist.).

**{¶27}** Nonetheless, the admission of other acts evidence lies within the broad discretion of the trial court, and a reviewing court will not disturb the trial court's decision in the absence of an abuse of that discretion. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14. " 'A trial court abuses its discretion when it

makes a decision that is unreasonable, unconscionable, or arbitrary.' " *State v. Keenan*, 143 Ohio St.3d 397, 2015-Ohio-2484, 38 N.E.3d 870, ¶ 7, quoting *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34.  An abuse of discretion includes a situation in which a trial court did not engage in a "sound reasoning process"; this review is deferential and does not permit an appellate court to simply substitute its judgment for that of the trial court.  *Darmond* at ¶ 34.

**{¶28}**  Here, the other acts evidence was relevant to establishing Ruble's motive to kill Lt. Clark.  " 'Motive' has been defined as a mental state that induces an act, the moving power that impels action for a definite result."  *See State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, 966 N.E.2d 958, ¶ 82, citing *State v. Williams*, 2d Dist. Montgomery No. 24149, 2011-Ohio-4726, and *State v. Young*, 7 Ohio App.2d 194, 196, 220 N.E.2d 146 (10th Dist.1966); *Black's Law Dictionary* 825 and 1039 (8th Ed.2004) (defining "motive" as "[s]omething, esp. willful desire, that leads one to act" and noting that "[w]hile motive is the inducement to do some act, intent is the mental resolution or determination to do it").  "Motive is generally relevant in criminal trials even though the matter involved is not an element of the offense that the state must prove to secure a conviction."  *Blankenburg* at ¶ 82, citing *Williams*, 2011-Ohio-4726.  Here the other acts evidence was relevant to show what Lt. Clark's investigation of Ruble's arrest of Beagle uncovered and why it led to Ruble's firing.

**{¶29}**  However, in applying the second step of the analysis and Evid.R. 403(A), the trial court abused its discretion.  Although the evidence of Ruble's treatment of Beagle was relevant to his motive to kill Lt. Clark, the detailed facts regarding Ruble's treatment of Beagle after arresting him did not shed any additional light on Ruble's

motive to kill Lt. Clark.  The state could have proved that by testimonial and documentary evidence simply indicating that Lt. Clark led an investigation into Ruble's excessive use of force, which led to Ruble's termination from the sheriff's department. Instead, the state introduced graphic evidence of Ruble's assaulting and threatening Beagle with the manifest intent to inflame the jury by showing that Ruble was a bad actor without significantly adding anything of value to establish the state's case. Thus under Evid.R. 403(A) the unfair prejudice of the other acts evidence substantially outweighed its probative value.

**{¶30}**  The state cites a solitary case in support of the trial court's Evid.R. 403(A) determination—*State v. Markins*, 4th Dist. Scioto No. 10CA3387, 2013-Ohio-602, ¶ 67. In *Markins*, we concluded that "evidence of the accused's own actions is not unfairly prejudicial as long as it is relevant to the essential elements of the offense."  *Id.* Although the other-acts evidence in that case was admissible in part to prove motive under Evid.R. 404(B), the evidence was presented primarily to show preparation for and intent to rob and kill the defendant's father, which was one of the offenses for which he was convicted.  Conversely, the other-acts evidence here, which provides marginally relevant evidence concerning the basis for the investigation that ultimately led to Ruble's firing, is much more attenuated.  Strictly construing this other-acts evidence against admissibility, as we must, we conclude that the trial court abused its discretion in determining that the unfair prejudice of this evidence was substantially outweighed by its probative value.

**{¶31}**  Nevertheless, we conclude that the trial court's error in admitting this evidence constituted harmless error beyond a reasonable doubt.  Under the harmless-

error analysis, the state bears the burden of demonstrating that the error did not affect the substantial rights of the defendant. *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 36. The Supreme Court of Ohio set forth a three-part test to determine whether an alleged error affected the substantial rights of the defendant and requires a new trial: "The reviewing court must ascertain (1) whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict, (2) whether the error was not harmless beyond a reasonable doubt, and (3) whether, after the prejudicial evidence is excised, the remaining evidence establishes the defendant's guilt beyond a reasonable doubt." *State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, 62 N.E.3d 153, ¶ 50, citing *Harris* at ¶ 37; *State v. Oldaker*, 4th Dist. Meigs No. 16CA3, 2017-Ohio-1201, ¶ 33.

**{¶32}** First, we find that Ruble was not prejudiced by the error because Ruble's own exhibit, which he offered into evidence to show that it was the sheriff rather than Lt. Clark who fired him, describes his termination from the sheriff's department. This exhibit detailed many of the same underlying circumstances of the excessive use of force incident. Thus any prejudice from admission of the state's other acts evidence was minimized by the details in Ruble's own exhibit, which stated:

> On December 6, 1979 after affecting the arrest of Gary Beagle on a charge of Breaking and Entering, while returning to Marietta, you ordered another officer, John Dake, to pull off the road, at which time you proceeded to question the Beagle subject, and when he did not respond you proceeded to slap him about the head and face, and then pull his hair while the subject remained handcuffed in the back seat of the patrol car and made threats to throw him in the Ohio River while handcuffed. In this manner you coerced a statement from the Beagle subject in violation of his constitutional rights. Such conduct, done in the presence of John Dake, a probationary officer who was in your charge, compromised Dake's position as an officer and made him an unwilling, if inactive participant to the assault, especially when you advised Beagle that there would be no

witnesses to your conduct.  Twice before you had been reprimanded by the Sheriff concerning alleged incidents of discourteous treatment of the public.

**{¶33}**  Therefore, the jury had most of the same other acts evidence before it.

**{¶34}**  It also had Smithberger's testimony implicating Ruble in the murder, and Howard's testimony establishing that Ruble, who had been drinking heavily on the day of the murder, had threatened to kill Lt. Clark.  And it had Ruble's own statement that No. 4 buckshot was the load to use to kill someone. The discovery of just such an empty shell at the murder scene implicated Ruble.  A car matching the description of Ruble's vehicle was observed near the crime scene and a military type boot, which Ruble would likely have been wearing in conjunction with his Army Reserve duty, left a print underneath the window in Clark's kitchen. Thus we conclude any error in admitting the other acts evidence was harmless beyond a reasonable doubt, and the remaining evidence established his guilt beyond a reasonable doubt.  Therefore, we overrule Ruble's first assignment of error.

### B.  Extrinsic Evidence of Smithberger's Prior Arrests

### to Impeach His Character for Truthfulness

**{¶35}**  In his second assignment of error Ruble contends that the trial court violated his constitutional rights to due process, confrontation, and compulsory process when it precluded him from calling witnesses who would have established that Smithberger, the key prosecution witness, had been arrested twice for impersonating a police officer.  Ruble objected to the trial court's ruling prohibiting him from introducing extrinsic evidence of these purported arrests to attack Smithberger's character for truthfulness.

**{¶36}** The court based its exclusionary ruling on Evid.R. 608(B), which provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid.R. 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified."

**{¶37}** Ruble concedes that Evid.R. 608(B) explicitly prohibited the admission of the extrinsic evidence even if Smithberger had denied the arrests on cross-examination. *See State v. Widmer*, 12th Dist. Warren No. CA2012-02-008, 2013-Ohio-62, ¶ 81 ("Evid.R. 608(B) permits cross-examination of a witness's character for truthfulness or untruthfulness[, but] [t]he cross-examiner must take the witness's answers as given and cannot contradict a denial either by confronting the witness with extrinsic evidence or proving the matter with such evidence"). But he argues that his constitutional rights to confrontation, due process, and compulsory process were violated because the denial of the extrinsic evidence pursuant to Evid.R. 608(B) precluded him from effectively cross-examining Smithberger, the key prosecution witness.

**{¶38}** But as Ruble concedes on appeal, he did not specifically object to the trial court's ruling based on the claimed constitutional violations he now raises, so he forfeited all but plain error in that regard. *See State v. Lawson*, 4th Dist. Highland No. 14CA5, 2015-Ohio-189, ¶ 14, quoting *State v. Knott*, 4th Dist. Athens No. 03CA30,

2004-Ohio-5745, ¶ 9, and citing Evid.R. 103(A)(1) (" 'Because counsel's objection did not apprise the [trial] court of this specific argument, we believe a plain error analysis of the issue is appropriate' "); *see also* Painter and Pollis, *Ohio Appellate Practice*, § 1:36 (2016) ("An objection to the admission of evidence on one ground * * * does not, for purposes of appeal, preserve objections to the evidence on other grounds").

**{¶39}** To prevail on a claim of plain error Ruble must show that an error occurred, that the error was plain, and that but for the error, the outcome of the trial clearly would have been otherwise. *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 69. Appellate courts take notice of plain error with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 62.

**{¶40}** " 'Evid.R. 608(B) provides a well-established rule of law that protects a legitimate state interest in preventing criminal trials from bogging down in matters collateral to the crime with which the defendant was charged.' " *State v. Myricks*, 2d Dist. Montgomery No. 22846, 2009-Ohio-5304, ¶ 26, quoting *State v. Boggs*, 63 Ohio St.3d 418, 422-423, 588 N.E.2d 813 (1995); *see also State v. Moshos*, 12th Dist. Clinton No. CA2009-06-008, 2010-Ohio-735, ¶ 18.

**{¶41}** In *Nevada v. Jackson,* _____ U.S. _____, 133 S.Ct. 1990, 1993, 186 L.Ed.2d 62 (2013) the United States Supreme Court held that the "constitutional propriety" of comparable evidentiary rules precluding a criminal defendant from introducing extrinsic evidence for impeachment purposes "cannot be seriously disputed." The court emphasized that it "has never held that the Confrontation Clause

entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes."

*Id.* at 1994 (emphasis sic); *see generally* Giannelli, *1 Baldwin's Oh. Prac. Evid.*, Section

608.5 (2016).

{¶42} Similarly, the Ohio Supreme Court has held that the constitutional right of

confrontation guarantees only an opportunity for effective cross-examination. *State v.*

*McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 170. If a trial court

permits cross-examination to expose a motive to lie, " 'it is of peripheral concern to the

Sixth Amendment how much opportunity defense counsel gets to hammer that point

home to the jury.' " *Id.* at ¶ 172, quoting *United States v. Nelson*, 39 F.3d 705, 708, (7th

Cir.1994).

{¶43} The trial court allowed Ruble to fully cross-examine Smithberger about his

purported arrests for impersonating a police officer. This included permitting his

counsel to suggest that the police coerced Smithberger into changing his story and lying

about Ruble's involvement by threatening to reveal the arrests to Smithberger's

licensing board if he did not cooperate:

> Q. What I'm asking you, is whether or not the officers that were there,
> were threatening to tell the Nursing Board that you had been arrested two
> times for impersonating an officer and that's what they were going to
> report to the Board?
>
> A. They could have. I don't remember that.
>
> * * *
>
> Q. So they were telling you, they were going to -- they were threatening
> you with reporting to the Nursing Board that you were impersonating an
> officer. You understand that, right?
>
> A. Yes.
>
> * * *

Q.  The officers were telling you, here's what we're going to do to you, if you don't answer our questions, right?

A.  Yes.

Q.  All right.  And they also tell you, apparently to give you some comfort, that if you cooperate, they're -- meaning the Nursing Board -- they're not even going to find out about it.  Right?

A.  Yes.

Q.  All right.  Now, they also then -- all up even through this accusation about impersonating an officer on two occasions, and the threats that you're going to go to prison, they talked to you about a way to avoid prison, did they not?

A.  Yes.

Q.  And what was that?  What were they going to do, to make sure that you did not go to prison?

A.  I had to cooperate with them.

**{¶44}**  In his closing argument Ruble's trial counsel emphasized this testimony to argue that Smithberger lied when he changed his story to implicate Ruble in Lt. Clark's murder:

> [T]hey said they had actually talked to the Nursing Board about the two impersonating an officer cases that were resolved as some kind of a traffic offense, and that they were going to take his license from him, but if you cooperate, no one will even know about this, including the Board."

**{¶45}**  Ruble has failed to establish that the trial court erred, much less committed plain error, by applying Evid.R. 608(B) and preventing him from introducing extrinsic evidence on the collateral matter of whether Smithberger was arrested for impersonating a police officer.  He cites no binding case in which a court has held that the preclusion of extrinsic evidence to impeach a witness resulted in a violation of the

defendant's constitutional rights.[2]  As noted, the United States Supreme Court has emphasized that it has never so held.  *Jackson*, __ U.S.__, 133 S.Ct. 1990, at 1994, 186 L.Ed.2d 62.  There being no error, plain or otherwise, we overrule Ruble's second assignment of error.

### C.  Ineffective Assistance of Counsel

{¶46}  In his third assignment of error Ruble claims that his trial counsel provided ineffective assistance because of various acts and omissions.  This assignment of error requires an initial review on our part as it normally cannot be raised at trial.

{¶47}  To prevail on a claim of ineffective assistance of counsel, a criminal appellant must establish (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 113; *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Knauff*, 4th Dist. Adams No. 13CA976, 2014-Ohio-308, ¶ 23.  In Ohio a properly licensed attorney is presumed competent.  *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62.  Thus, in reviewing the claim of ineffective assistance of counsel, we must indulge in "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the

---

[2] We acknowledge that in *State v. Williams*, 21 Ohio St.3d 33, 487 N.E.2d 560 (1986), the Supreme Court of Ohio held that the rape shield law did not preclude proof by extrinsic evidence of the rape victim's reputation in the community as a prostitute or her prior sexual relations with the victim to establish lack of consent as an element of the rape charges. In *Williams* the victim testified on direct examination that she never consented to sex with men because she was a lesbian; this case is distinguishable from *Williams* because the evidence here does not directly "negate the implied establishment of an element of the crime charged." *Id*. at 36.

challenged action 'might be considered sound trial strategy.' " *Strickland* at 697.

Failure to satisfy either part of the test is fatal to the claim. *Id.*; *State v. Bradley*, 42 Ohio

St.3d 136, 143, 538 N.E.2d 373 (1989).

1.   Failure to File Motion to Suppress Ruble's

Custodial Statement to Law Enforcement Officers

**{¶48}**  Initially Ruble claims that his trial counsel provided ineffective assistance

by failing to move to suppress his custodial statement to law enforcement officers

because he never waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct.

1602, 16 L.Ed.2d 694 (1966).

**{¶49}**  On September 9, 2014, law enforcement officers arrested Ruble for the

aggravated murder of Lt. Clark.  While handcuffed Ruble provided a statement to law

enforcement officers over two to three hours of interrogation.  After he was arrested and

handcuffed, the officers read him his Miranda rights and proceeded to question him:

> JS:  Mitch, I'm Jeff Severs.  Jon Jenkins' right here, this is Bruce Schuck.
> We're part of a Cold Case Task Force that's set up by the Attorney
> General's Office out of Columbus.
>
> Before we go any further, I want to read you your rights, okay?
>
> Before we ask you any questions, you must understand your rights.  You
> have the right to remain silent.  Anything you say can and will be used
> against you in court.  You have the right to talk to an attorney, lawyer, for
> advice before we ask you any questions and have him with you during
> questioning.  If you cannot afford an attorney, lawyer, one will be
> appointed for you before any questioning, if you wish.  If you decide to
> answer questions now without an attorney, lawyer present, you will still
> have the right to stop answering at any time.
>
> You also have the right -- to request an attorney, lawyer at any time during
> these proceedings.  Okay?
>
> I'm going to step out.  I got to make a call.

(Jeff Seevers exits the room.)

BS:  Mitch, like I told you, I'm Bruce Schuck.  This is Jon Jenkins.  We have worked this investigation for some time, and the whole rights things, is you understand your rights.[3] And that's a formality, but we want to talk to you about the Officer Ray Clark homicide and what happened on February 7th of 1981.  And you know, there's a lot of things we know about the investigation, and we're going to share some of them with you -- not all of it, but we're going to share with you some of the evidence that put you in the predicament you're in today.

MR:  First and foremost, I didn't kill Ray Clark.  I have no knowledge of it. I think I've explained that to several people over the years.  I know there's been indication that I was involved, but I wasn't.  Everything that was said to me, presented to me was all circumstantial.  I'll leave it at that.

**{¶50}**     Although Ruble did not expressly waive his rights verbally or in writing, "[a] court may infer from the totality of the circumstances that a defendant voluntarily, knowingly, and intelligently waived his rights."  *State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, 853 N.E.2d 279, ¶ 9, citing *State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844, 853 (1988); *State v. Ward*, 4th Dist. Scioto No. 10CA3370, 2012-Ohio-3446, ¶ 12.  The totality of circumstances include:  the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.  *Lather* at ¶ 9.

**{¶51}** It would have been preferable for the interrogating officers to secure Ruble's verbal or written acknowledgement that he understood his rights and waived them before answering their questions.  However, the totality of the circumstances support a finding that he voluntarily, knowingly, and intelligently waived his rights.  On the DVD of Ruble's statement, he nodded his head affirmatively to the officer's

---

[3] At this point Ruble nods his head affirmatively as can be seen on the state's exhibit of the DVD of his interrogation.

statement "You understand your rights." Ruble was an adult with a lengthy career in law enforcement, including as a sergeant in a sheriff's department and a corrections officer when he made the statement. Although the placement of his hands in the back while handcuffed initially caused him some discomfort, the officers relieved this discomfort by allowing him to have his hands in front on a table. At two or three hours the interrogation was lengthy, but it was not overly so, and although keeping him in handcuffs is troublesome, it was not unconstitutionally oppressive. There is nothing in the lengthy statement that indicates that Ruble did not voluntarily, knowingly, and intelligently waive his rights and continue speaking to the officers.

{¶52} Because a motion to suppress on this ground would have been meritless, Ruble's trial counsel was not deficient for failing to file one. *See State v. Novak*, 4th Dist. Gallia No. 16CA4, 2017-Ohio-455, ¶ 24. "We must presume that trial counsel was effective if counsel 'could have reasonably decided that filing a suppression motion would be a futile act, even if there is some evidence to support a motion.'" *State v. Siggers*, 4th Dist. Ross No. 13CA3368, 2014-Ohio-506, ¶ 10, quoting *State v. Walters*, 4th Dist. Scioto No. 12CA949, 2013-Ohio-772, ¶ 20. We reject Ruble's first ineffective-assistance claim.

2.  Failure to File Motion to Redact Parts of

Ruble's Recorded Custodial Statement

{¶53} Ruble next claims that his trial counsel was deficient for failing to move to redact certain portions of his recorded custodial statement. First he contends that his trial counsel should have moved to redact those parts of his custodial statement where officers questioned him about his purported misconduct as an officer. More specifically,

Ruble now objects to: (1) officers questioning him about his improper use of force at the Beverly Police Department; (2) officers informing him that his own personnel record from the sheriff's department contradicted him about his violent tendencies; (3) officers informing him that his personnel file contained several incidents where it is claimed that he roughed up individuals in handcuffs; and (4) officers questioning him about whether he had a substance abuse problem—alcohol or drugs—at the time of the murder.

{¶54} Ruble analogizes these matters to the impermissible other acts evidence he objected to in his first assignment of error, but claims they are even further removed and are not admissible on the issue of motive. We reject Ruble's contention because unlike the evidence concerning his excessive use of force against Beagle, the state did not introduce testimonial extrinsic evidence concerning his other purported misconduct while employed as a law enforcement officer, or the use of drugs. Although the state did introduce testimonial evidence concerning Ruble's admission to a police officer that alcohol made him violent and to his use of alcohol on the same day of the murder, he does not generally argue that this testimony was inadmissible, except for his next ineffective-assistance claim.

{¶55} Moreover, Ruble's own exhibit referring to his termination as a Washington County Deputy Sheriff indicated that "[t]wice before [he] had been reprimanded by the Sheriff concerning alleged incidents of discourteous treatment of the public," so that these other incidents would have also been relevant to his discharge and thus his motive for killing Lt. Clark. And as noted in resolving his first assignment of error, Ruble's prior misconduct regarding the use of force against Beagle incident was before the jury through this same exhibit. Ruble denied any substance abuse during his

custodial statement.  Evidence of his alcohol abuse was also already properly introduced in the form of Howard's testimony and his own earlier statement to law enforcement officers that he drank wine on his way back to Marietta on the evening of the murder. Ruble has not established that his trial counsel was ineffective for failing to request the redaction of these limited references in his post-indictment custodial statement.

{¶56}  Moreover, assuming his trial counsel's performance was deficient for failing to move to redact all or some of these limited instances of interrogation, Ruble has not established any resulting prejudice, i.e., a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  As noted, most of Ruble's prior misconduct as a law enforcement officer had already been admitted. And Ruble denied any alcohol or drug abuse during his custodial statement.  Evidence of alcohol abuse to contradict his custodial statement was admissible in the form of Howard's testimony and his own earlier statement to law enforcement officers that he drank wine on his way back to Marietta on the evening of the murder. He denied any drug abuse, and the state introduced no evidence to the contrary.  Ruble has not established that his trial counsel was ineffective for failing to request the redaction of these limited references in his post-indictment custodial statement.

{¶57}  Next Ruble contends that his trial counsel provided ineffective assistance by failing to request the redaction of those portions of his custodial statement in which the interrogating officers expressed their opinions that he was guilty or lying.  The following are illustrative of these questions:

BS:  Okay  Let's you and I agree that we're not going to go backwards with any more lies, because you're sitting here and misrepresented some things.  Okay?

MR:  Okay.

BS:  Can we agree you're not going to go backwards?

MR:  I have been as truthful as I am capable of at this particular point in time.  Beyond that, no lies.

* * *

BS:  Yeah, and I'll be honest with you, Mitch, I'm -- I'm having a hard time sympathizing with you, simply because you're not manning up and taking responsibility.  I feel for your wife, your kids, your grandkids, because you've been taken away from them.  I feel bad for Patricia Clark who knelt -- knelt down beside her husband in that blood.

MR:  Yeah.

**{¶58}**  In general, opinion testimony of a police officer about the guilt of the defendant is inadmissible.  *See generally State v. Battiste*, 8th Dist. Cuyahoga No. 102299, 2015-Ohio-3586, ¶ 35-36.  That is, "[a] police officer's opinion that an accused is being untruthful is inadmissible."  *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 122.

**{¶59}**  But the key to the cases that Ruble cites is that the error was caused by police officers allegedly providing opinion testimony under oath that the defendant was guilty.  *See, e.g., State v. Tyler*, 50 Ohio St.3d 24, 25, 553 N.E.2d 576 (1990).  By contrast the objections here are to unsworn statements made by police officers to the defendant during his custodial interrogation.  The rule that a police officer's opinion that an accused is being untruthful is inadmissible is applicable to testimony, not recorded interrogation.  *See State v. Bagley*, 3d Dist. Allen No. 1-13-31, 2014-Ohio-1787, ¶ 66

("the rule from *Davis* that [appellant] cites applies to testimony, not videos of interviews").

**{¶60}** And, Bruce Schuck, a special deputy with the Washington County Sheriff's Office, testified that the officers employed the "John Reid technique" of interrogations, which includes giving false information and contesting the interviewees on their version of the facts. Thus the jury was well aware from this testimony that the statements and questions of the officers during their post-indictment custodial interrogation of Ruble were not necessarily truthful and were meant to elicit admissions from him.

**{¶61}** Furthermore, the officers who questioned Ruble in the contested post-indictment interrogation were present at trial and subject to cross-examination concerning their statements, questions, and comments during the interrogation. *See State v. Gray*, 9th Dist. Wayne No. 08CA0057, 2009-Ohio-3165, ¶ 17 (rejecting claim that officers' lies during a taped interrogation of a criminal defendant constituted prejudicial error because, among other reasons, the officers who questioned the defendant testified at trial and were subject to cross-examination). We cannot discern any prejudice to Ruble from these statements and questions.

**{¶62}** Ruble has failed to establish that his trial counsel's failure to redact portions of his post-indictment interrogation constituted ineffective assistance of counsel.

### 3. Failure to Object to Part of Law Enforcement Officer's Testimony that Was Not Based on his Personal Knowledge

**{¶63}** Next Ruble claims that his trial counsel provided ineffective assistance because he failed to object to the testimony of Detective Lieutenant Jeff Seevers of the

Washington County Sheriff's Office's Cold Case Unit concerning a conversation then-Sheriff Robert Schlicher had with Ruble in January 2004. Lt. Seevers described a meeting between Sheriff Schlicher and Ruble where Ruble said he used to drink wine, but it made him do crazy things; the sheriff mentioned to Ruble that on the night of Lt. Clark's murder, Ruble admitted he had been drinking wine heavily.

**{¶64}** Lt. Seever testified that during the conversation, he and another employee stood outside the door, which was hollow, so they could overhear the conversation between the sheriff and Ruble "quite easily" and that the sheriff's report of it was "accurate":

> Q. All right, and did Sheriff Schlicher give you any direction as to what you should do while he was speaking with Mr. Ruble?
>
> A. At that time, me and Mark Warden decided to step outside the door. And -- and we were in the door that led to our office. And it was a wooden door, but it was hollow, so you could hear through it quite easily.
>
> * * *
>
> Q. All right. So, Sheriff Schlicher was going to have this conversation with Mitch Ruble and you and Mark Warden were advised to listen in the -- from the office next door and listen to everything that was said?
>
> A. That is correct.
>
> Q. And did you do that?
>
> A. Yes, we did.
>
> Q. And following Mr. Ruble, Mitch Ruble's departure from the Sheriff's Office, did you get back together with Sheriff Schlicher and Mark Warden and yourself?
>
> A. Yes, as soon as Mitch Ruble left, we sat down and we had a briefing on * * * the conversation between the sheriff and Mitch Ruble and then we had the sheriff dictate his report right there.
>
> Q. And were you there with the sheriff when he dictated that report?

A.  All three of us were there, yes.

Q.  And did that -- as he dictated that, did the things as he was dictating as to what had occurred * * * was that accurate as to what had occurred, as far as you could hear?

A.  Yes, it was.

Q.  And did you subsequently see, was that dictation subsequently transcribed?

A.  Yes, it was.

Q.  And did you see it within a month or two after that, at least?

A.  It was just a few days later.  Yeah, we all reviewed it again to make sure it was accurate.

Q.  And it was fairly accurate?

A.  Yes, it was.

{¶65}  "Evid.R. 602 allows lay witnesses to testify about matters within their personal knowledge"; "[a]n individual has personal knowledge of a matter when the individual gains the knowledge through firsthand observation or experience."  *See State v. Shahan*, 4th Dist. Washington No. 02CA63, 2003-Ohio-6945, ¶ 38, citing *Bonacorsi v. Wheeling & Lake Ry. Co.*, 95 Ohio St.3d 314, 2002-Ohio-2220, 767 N.E.2d 707, ¶ 26; *see also State v. Petty*, 10th Dist. Franklin No. 15AP-950, 2017-Ohio-1062, ¶ 53 ("Evid.R. 602 provides that '[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter').  Notwithstanding Ruble's emphasis on the qualifiers in some of the questions to which Lt. Seevers responded, i.e., "fairly accurate" and "as far as you could hear," his testimony was sufficient to establish that he had personal knowledge about the conversation between Sheriff Schlicher and Ruble because he overheard it, albeit remotely, from outside a hollow door through which he could hear "quite easily."  And he

reviewed the sheriff's dictated statement regarding the conversation to "make sure it was accurate." Therefore, Ruble's counsel was not deficient for failing to raise this meritless objection. We reject Ruble's third ineffective-assistance claim.

#### 4. Failure to Preserve Issues for Appeal

**{¶66}** In Ruble's final ineffective-assistance claim, he contends that his counsel performed unreasonably by failing to preserve the issues raised in his second (trial court's preclusion of extrinsic evidence of Smithberger's two prior arrests for impersonating a police officer) and fourth (trial court's jury instruction on aiding and abetting) assignments of error. For the reasons discussed in our decision overruling these assignments of error, we also reject Ruble's final ineffective-assistance claim.

**{¶67}** Therefore, Ruble has failed to establish that his trial counsel provided ineffective assistance of counsel. We overrule his third assignment of error.

#### D. Jury Instruction on Aiding and Abetting

**{¶68}** In his fourth assignment of error Ruble argues that the trial court committed plain error when it instructed the jury on aiding and abetting. Although Ruble's trial counsel objected to the state's requested charge on aiding and abetting, he did not renew the objection after the jury had been instructed, but before it retired.

**{¶69}** Although the parties proceed on the basis of plain error, we assume that Ruble's objection to the instruction before the parties' closing argument sufficiently preserved this issue for appeal. *See* Crim.R. 30(A) ("On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the

grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury").

**{¶70}** A jury instruction must present a correct, pertinent statement of the law that is appropriate to the facts. *State v. Barry*, 145 Ohio St.3d 354, 2015-Ohio-5449, 49 N.E.3d 1248, ¶ 25. Thus, "[r]equested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 240. " 'Our review concerning whether jury instructions correctly state the law is de novo.' " *State v. Kelly*, 2016-Ohio-8582, __ N.E.3d __, ¶ 86 (4th Dist.), quoting *State v. Kulchar*, 4th Dist. Athens No. 10CA6, 2015-Ohio-3703, ¶ 15.

**{¶71}** Ruble argues that he did not receive adequate notice of the aider and abettor charge because he was indicted as the principal offender on the aggravated murder charge and the state's case proceeded on that theory. We reject his argument because under R.C. 2923.03(F), "[a] charge of complicity may be stated in terms of [that] section, or in terms of the principal offense." "Accordingly, a defendant who is 'indicted for aggravated murder in terms of the principal offense * * * [is] on notice that evidence could be presented that he was either a principal offender or an aider and abetter.' " *McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, at ¶ 244, quoting *State v. Ensman*, 77 Ohio App.3d 701,703, 603 N.E.2d 303 (11th Dist.1991).

**{¶72}** "As a result, a jury instruction on complicity is proper as long as 'the evidence adduced at trial could reasonably be found to have proven the defendant guilty as an aider and abettor.' " *McKelton* at ¶ 244, quoting *State v. Perryman*, 49 Ohio

St.2d 14, 258 N.E.2d 1040 (1976), paragraph five of the syllabus, *vacated on other grounds*, 438 U.S. 911, 98 S.Ct. 3136, 57 L.Ed.2d 1156 (1978); *see also State v. Spencer*, 2017-Ohio-456, __ N.E.3d __, ¶ 53.

**{¶73}** Next Ruble argues that because the state's entire case was premised on its claim that he was the principal offender, the trial court erred in giving the instruction on aiding and abetting. We reject his argument because it is well established that " '[a] jury, sitting as the trier of fact, is free to believe all, part or none of the testimony of any witness who appears before it.' " *State v. Reyes-Rosales*, 4th Dist. Adams No. 15CA1010, 2016-Ohio-3338, ¶ 17, quoting *State v. West*, 4th Dist. Scioto No. 12CA3507, 2014-Ohio-1941, ¶ 23; *see also McKay Mach. Co. v. Rodman*, 11 Ohio St.2d 77, 82, 228 N.E.2d 304 (1967) ("The jury can accept all, a part or none of the testimony offered by a witness whether it is expert opinion or eyewitness fact, whether it is merely evidential or tends to prove the ultimate fact").

**{¶74}** In his custodial statement Ruble denied any responsibility for or knowledge of who perpetrated the murder. The evidence included testimony that the murder weapon was a pump action shotgun that Smithberger once possessed, that Smithberger previously lied about his involvement in the crime, that Smithberger looked up to Ruble, and that Ruble repeatedly told the police he did not shoot Lt. Clark. Under these circumstances, the jury could have reasonably determined that even if Ruble was not the shooter, there was sufficient evidence that he at least aided and abetted Smithberger in the commission of the aggravated murder. That is, the jury could have credited Ruble's statements to officers that he did not personally shoot Lt. Clark, but could have reasonably inferred that he directed Smithberger to do so. This is consistent

with the general rule that the weight and credibility of evidence are to be determined by the trier of fact because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility. *See State v. Kirkland*, 140 Ohio St.3d 73, 15 N.E.3d 818, 2014-Ohio-1966, ¶ 132; *Reyes-Rosales* at ¶ 17. Therefore, the trial court did not commit error, plain or otherwise, in instructing the jury that it could find Ruble guilty as an aider and abettor. We overrule Ruble's fourth assignment of error.

## E. Cumulative Errors

**{¶75}** In his fifth assignment of error Ruble asserts that the cumulative effect of the errors in his first four assignments of error warrant the granting of relief. Under the cumulative-error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995), citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. We reject Ruble's assertion because "[t]he doctrine is not applicable to the case at bar as we do not find multiple instances of harmless error." *Garner* at 64. We have found only one instance of harmless error - the admission of testimonial other acts evidence as discussed in his first assignment of error. Ruble has not established that he was deprived of his constitutional right to a fair trial. We overrule Ruble's fifth assignment of error.

## IV. CONCLUSION

**{¶76}** Ruble has not established any reversible error.  Having overruled his assignments of error, we affirm his conviction for aggravated murder.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

McFarland, J. & Hoover, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
        William H. Harsha, Judge



### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**